E. M. ROSE, APPELLEE, v. CITY OF FAIRMONT, APPELLANT.

300 N. W. 574

FILED OCTOBER 31, 1941.   No. 31239.

*Blackledge & Conway,* for appellant.

*Robert B. Waring, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

PAINE, J.

This is an appeal by the city of Fairmont, defendant, from an award given E. M. Rose, plaintiff, under the workmen's compensation law.

The main facts are not in dispute. It appears that plaintiff, a man 50 years of age, had been water and light commissioner of the city of Fairmont for about 12 years, and

was earning $150 a month. Plaintiff is a slender man, weighing 153 pounds, and five feet eight inches tall. The city owned a Model T Ford truck, which was kept in a small lean-to at the back of the plant, and was used by plaintiff and other employees. While this Model T had a starter, it had not been used for several months because it ran the battery down so fast, therefore it was cranked by hand.

On the morning of April 12, 1940, the plaintiff needed to use the car, and with a helper went out and they took turns cranking it, each one turning it over six or seven times, then the other taking a hand, and as it worked loose perhaps turning it 15 or 20 complete revolutions at a trial. Finally either the plaintiff or Palmer got it to going. When plaintiff got half way through the cranking operation, he felt a pain in his chest, but did not stop or say anything to Palmer about it, and continued taking his turn at the cranking job.

After the car started, plaintiff drove to the blacksmith shop and got a piece of bar, and the pain in his chest continued, and he sat there a few minutes, and the pain subsided, and he drove the Ford out to the lift station and sewer check, about a quarter of a mile south of the city of Fairmont. When he got down there to the plant where they pump the sewerage out of the city, he went down a perpendicular ladder about 21 feet. Plaintiff testified: "You have to go down a ladder, straight down the side of this thing. And when I opened the manhole cover on top of it and pushed it back the pain started up again, and consequently on the way down the latter (ladder) it got worse. I stayed down there long enough to inspect the machinery and it kept right on hurting and I decided it was about time for me to get home, and I started up. There was a place part way down and I lay there a few moments. I thought it might quit if I lay down and relax, but it didn't. Then I climbed on out and got 'Mr. Ford' wound up."

He remained at the sewer station about 20 minutes, and started back to town, and drove home to relax and rest and find out what was wrong, and he said he went in the

house, "and as all wives do the wife got quite excited; and the first thing she did was bounce to the telephone and call a doctor." Dr. Ashby came and examined him in bed, and he laid around home for several months, not able to do any work because he would get dizzy and have a pain in his chest.

Dr. Uridil, called by defendant, testified that a couple of days before the trial in the district court plaintiff came to his office in Hastings to be examined, and that he also read the testimony of Dr. Ashby and Dr. Covey. He testified that plaintiff's blood pressure was rather low, 105/86. His heart was moderately enlarged, sounds were "close rhythm or tick-tock rhythm;" that the plaintiff had a slight hardening of the arteries immediately under the skin. Dr. Uridil said the heart would recover itself if given time and not abused, but that he would never have a complete normal recovery, although he might be able to walk about and supervise, and do manual work if he did not overload his heart. Dr. Uridil was asked to assume that plaintiff had a coronary thrombosis on April 12, 1940, and to state the cause of it. He said that coronary thrombosis cannot occur in a normal healthy artery. There must be some diseased condition and arteriosclerosis is a normal changing in the arteries, which does not happen all at once, and may be rapid or gradual in its onset.

It was perhaps 45 minutes from the time of the alleged accident until Dr. Ashby was called to plaintiff's home. Dr. Ashby testified that he found him in bed, that he was in a semiconscious condition, and after administering a stimulant he could hear his heart beat, and took his blood pressure, which was very low, 85/60; that plaintiff told him that when he got down in the pit he thought he was not going to get out, but he did get out and drove home, and probably suffered a collapse after he got home; that he suffered a dilatation. He said that after a few days plaintiff said he felt as well as he ever did, or gradually returned to normal. His pulse went down to around 70, and he advised plaintiff to go down and see Dr. Covey at Lincoln.

In his deposition Dr. George W. Covey testified that plaintiff consulted him on May 1, 1940, in his office at Lincoln. His principal complaint was of a recent attack of pain in his chest and prostration. In getting the history of the case, he found that he had had influenza during November, 1939, and again in January, 1940. Dr. Covey's examination consisted of a fluoroscopic examination of the chest under X-ray and electrocardiograms. The examination showed that plaintiff was suffering from the effect of coronary thrombosis, with resulting pericarditis. In giving a number of causes that could have caused the coronary thrombosis, such as plaintiff suffered on April 12, Dr. Covey made this answer: "Coronary thrombosis occurs usually under one or two conditions; either occurs while the patient is resting and perhaps asleep, or occurs when he is exerting himself, either ordinarily with some other factor entering in, like temperature or state of the digestive tract or actual amount of exertion he is undergoing in relation to what is usual for him. Those are the two large groups in which coronary thrombosis occurs."

The district court allowed $15 a week from April 12, 1940, for 25¼ weeks, and allowed $7.50 a week for a period of 274¾ weeks, and allowed $10 a week thereafter so long as permanent partial disability continues. In addition, it allowed an attorney's fee of $100, to Dr. Ashby, $177, to Dr. Covey, $35, and to a nurse, $5.

In *Shamp v. Landy Clark Co.*, 134 Neb. 73, 277 N. W. 802, the deceased was unloading three tons of coal from his truck, when suddenly he crumpled up and died without regaining consciousness. The autopsy was conducted by Dr. Covey, and the doctors agreed that death was caused by aortic stenosis of the heart, Dr. Ryerson adding that the ventricular dilation might have been caused by inflammation, calcification, or hardening (sclerosis) of the blood vessels. It was held that, where any one or more of the essential elements of an accident are absent, there can be no recovery for accidental injury or death.

In *Gilkeson v. Northern Gas Engineering Co.*, 127 Neb.

124, 254 N. W. 714, the plaintiff pushed an automobile in the mud, causing a strain to the muscles of the heart, which brought about a mitral regurgitation, which resulted in total permanent disability, and it was held: "Mere exertion that would not by itself produce compensable disability, and which is not greater in extent than that ordinarily incident to an employment, but which combines with a preexisting disease to produce a disability, is not an injury caused by accident that becomes such a part of the proximate cause of such disability as to be compensable under the provisions of the workmen's compensation act." It was stated in the text: "The exertion shown in this case is not shown to have been an injury caused by accident that formed any part of the proximate cause of the disability for which compensation is sought." The award was set aside and the action dismissed.

We are cited by plaintiff to the case of *Schirmer v. Cedar County Farmers Telephone Co.*, 139 Neb. 182, 296 N. W. 875, as a parallel case. In that case a workman, while climbing a telephone pole with spurs, slipped a few inches, and he grabbed the pole with his left arm, catching the weight of his body and thus preventing a fall. He immediately felt a sharp pain in his chest, went home a mile and a half, suffering great pain, then was taken to a hospital, where a definite diagnosis of coronary thrombosis was made. This court held that this accident arose out of, and in the course of, his employment, and sustained an award. In this case there was a very definite accident in slipping on the pole, from which moment he suffered great pain, and was immediately taken home, and then to a hospital. It is not difficult to distinguish this case from the one at bar, in which no accident occurred, as defined by the Nebraska statute (Comp. St. Supp. 1939, sec. 48-152), and, further, the plaintiff was cranking a car, which was something ordinarily incident to his employment, and no unforeseen or unexpected event happened suddenly or violently.

Other cases cited by plaintiff, such as *Manning v. Pom-*

*erene*, 101 Neb. 127, 162 N. W. 492, *Herbert v. State*, 124 Neb. 312, 246 N. W. 454, *Esau v. Smith Bros.*, 124 Neb. 217, 246 N. W. 230, and *Montgomery v. Milldale Farm & Live Stock Improvement Co.*, 124 Neb. 347, 246 N. W. 734, can each be distinguished from the case at bar.

The medical evidence discloses that the plaintiff suffered a coronary thrombosis, which does not arise in a normal healthy condition of the arteries. Such a thrombosis may occur while one is asleep, or while exercising, or from overloading the stomach with food so that it presses upon the heart. In this case, while cranking a Model T Ford, plaintiff felt a pain in his chest, but continued cranking at intervals. When the Ford started, he drove to a blacksmith shop, did his errand, and remained seated for a few minutes, then cranked the car and drove to the sewer plant, and climbed down a perpendicular ladder 21 feet long, attended to what called him there, but, still feeling the pain in his chest, he again cranked the Ford and drove home, where he went to bed, and his wife called a doctor. Was the heart attack, caused by the continued cranking of the Ford on a cold morning, an accident in the accepted definition of that term?

Under our Nebraska workmen's compensation law a claimant has the burden of establishing, by a preponderance of the evidence, a right to compensation. It cannot be left to surmise or conjecture, or based upon possibilities or probabilities, but must be established in the legal way, and not by guess or speculation. *Wayne County v. Lessman*, 136 Neb. 311, 285 N. W. 579; *Saxton v. Sinclair Refining Co.*, 125 Neb. 468, 250 N. W. 655; *Bartlett v. Eaton*, 123 Neb. 599, 243 N. W. 772; *Omaha & C. B. Street R. Co. v. Johnson*, 109 Neb. 526, 191 N. W. 691; *Amos v. Village of Bradshaw*, 128 Neb. 514, 259 N. W. 374; *Price v. Burlington Refrigerator Express Co.*, 131 Neb. 657, 269 N. W. 425.

Mere exertion which is not greater than that ordinarily incident to employment, but which combines with preexisting disease to produce disability, is not a compensable "accidental injury."

Proof must be made by satisfactory evidence leading to the direct conclusion, or a legitimate legal inference, that an accidental injury occurred which caused the disability. *Wayne County v. Lessman,* 136 Neb. 311, 285 N. W. 579; *Gilkeson v. Northern Gas Engineering Co.,* 127 Neb. 124, 254 N. W. 714; *Shamp v. Landy Clark Co.,* 134 Neb. 73, 277 N. W. 802.

We are of the opinion that no award can be supported by the evidence in this case, and the action is hereby dismissed.

REVERSED AND DISMISSED.

CARTER, J., concurring in the result.

I cannot agree with the court's attempt to distinguish this case from *Schirmer v. Cedar County Farmers Telephone Co.,* 139 Neb. 182, 296 N. W. 875. In my judgment, they are identical in principle and call for similar conclusions. In both cases the plaintiff was suffering from coronary thrombosis. In each case the disease caused the disability, superinduced by overexertion. In the *Schirmer* case the exertion and resulting exhaustion were the result of climbing a telephone pole in the course of plaintiff's employment. In the instant case it was the result of cranking a truck in the course of duty.

In both cases coronary thrombosis was the cause of the purported accident and the resulting disability. Instead of an accident causing the disability in each of these cases, the diseased condition of the claimant caused that which was described as an accident. Consequently, the cases cannot be satisfactorily distinguished. Except as herein noted, I concur with the opinion adopted by the majority.